1   Alan Harris (SBN 146079)
    David Zelenski (SBN 231768)
2   HARRIS & RUBLE
    5455 Wilshire Boulevard, Suite 1800
3   Los Angeles, CA 90036
    Telephone: (323) 931-3777
4   Facsimile: (323) 931-3366

5   Attorneys for Plaintiff

6

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  CATHERINE TREMBLAY,                Case No. CV 07-6009 EDL
    individually and on behalf of all
12  others similarly situated,         **PLAINTIFF'S MEMORANDUM OF
                                       POINTS AND AUTHORITIES IN
13              Plaintiff,             SUPPORT OF MOTION FOR
                                       CERTIFICATION OF
14        v.                           COLLECTIVE ACTION**

15  CHEVRON STATIONS, INC., and        Date:  May 6, 2008
    DOE ONE through and including      Time:  9:00 a.m.
16  DOE TEN,                           Place:  Courtroom E, 15th Floor

17              Defendants.            *Assigned to Hon. Elizabeth D. LaPorte*

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

I.      Introduction:  The Issue to be Decided …………………………………………... 1

II.     The Law Applicable to a Request for Certification:  Only
        a Modest Showing Needs to Be Made ……………………………………… 7

III.    Notice ……………………………………………………………… 19

IV.     Conclusion …………………………………………………………… 19

# TABLE OF AUTHORITIES

*Cases*

Alba v. Papa John's USA
2007 U.S. Dist. LEXIS 28079 (C.D. Cal. 2007) ……………………………………… 14

Bayles v. Am. Med. Response
950 F. Supp. 1053 (D. Colo. 1996) ……………………………………………………... 9

Blackie v. Barrack
524 F.2d 891 (9th Cir. 1975) ……………………………………………………… 14, 15

Bureerong v. Uvawas
922 F. Supp. 1450 (C.D. Cal. 1996) ……………………………………………….... 11

Burkhalter v. Sewerage & Water Bd.
791 So. 2d 665 (La. Ct. App. 2000) ……………………………………………….. 5

Caridad v. Metro-North Commuter R.R.
191 F. 3d 283 (2d Cir. 1999) ……………………………………………………….... 17

Castle v. Wells Fargo Fin., Inc.
2008 WL 495705 (N.D. Cal. Feb. 20, 2008) ……………………………………… 1, 8

Dukes v. Wal-Mart, Inc.
222 F.R.D. 189 (N.D. Cal. 2004) …………………………………………………… 16

Dukes v. Wal-Mart, Inc.
474 F.3d 1214 (9th Cir. 2007) ……………………………………………... 16, 17, 18, 19

Edwards v. City of Long Beach
467 F. Supp. 2d 986 (C.D. Cal. 2006) ……………………………………………… 10

Eisen v. Carlisle and Jacquelin
417 U.S. 156 (1974) ……………………………………………………………… 13, 14

Grayson v. K Mart Corp.
79 F.3d 1086 (11th Cir. 1996) …………………………………………………….... 8

Hoffman-La Roche, Inc. v. Sperling

493 U.S. 165 (1989) …………………………………………………………….. 9

Sperling v. Hoffman-La Roche, Inc.
118 F.R.D. 392 (D.N.J. 1988) ……………………………………………………... 9

In re Visa Check/MasterMoney Antitrust Litig.
280 F.3d 124 (2d Cir. 2001) ……………………………………………… 17, 18

Johnson v. TGF Precision Haircutters, Inc.
319 F. Supp. 2d 753 (S.D. Tex. 2004) …………………………………….. 11, 12

Leuthold v. Destination Am.
224 F.R.D. 462, 467 (N.D. Cal. 2004) ……………………………………………  10

L.H. v. Schwarzenegger
2007 U.S. Dist. LEXIS 18728 (E.D. Cal. 2007) ……………………………….. 18, 19

Murphy v. Kenneth Cole Prods., Inc.
40 Cal. 4th 1094 (2007) …………………………………………………………..5

Osmer v. Aerospace Corp.
1982 U.S. Dist. LEXIS 15927 (C.D. Cal. 1982) ……………………………….. 15, 16

Pendlebury v. Starbucks Coffee Co.
2005 U.S. Dist. LEXIS 574 (S.D. Fla. 2005) …………………………………….. 12

Realite v. Ark Rests. Corp.
7 F. Supp. 2d 303 (S.D.N.Y. 1998) …………………………………………….. 9

Selzer v. Bd. of Educ. of City of New York
112 F.R.D. 176 (S.D.N.Y. 1986) ……………………………………………… 17

St. Marie v. E. R.R. Ass'n.
72 F.R.D. 443 (S.D.N.Y. 1976) ……………………………………………… 8

Thiessen v. G.E. Elec. Capital Corp.
267 F.3d 1095 (10th Cir. 2001) …………………………………………….. 11

Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.

209 F.R.D. 159 (C.D. Cal. 2002) ……………………………………………… 17

Wang v. Chinese Daily News, Inc.
231 F.R.D. 602 (C. D. Cal. 2005) ……………………………………………….. 8

Wynn v. NBC
234 F. Supp. 2d 1067 (C.D. Cal. 2002) ……………………………………….. 10

*Statutes & Regulations*

29 C.F.R. § 778.107 ………………………………………………………….. 3

29 C.F.R. § 778.108 ………………………………………………………….. 3

29 C.F.R. § 778.115 ………………………………………………………….. 4

Cal. Civ. Proc. Code § 382 …………………………………………………… 9

Cal. Lab. Code § 226.7 ……………………………………………………….. 7

Fed. R. Civ. P. 23 ……………………………………………………… *passim*

29 U.S.C. § 207 ……………………………………………………….. 2, 3, 6

29 U.S.C. § 216 …………………………………………….. 7, 8, 9, 10, 11

29 U.S.C. § 626 …………………………………………………………….. 9

*I.     Introduction:  The Issue to be Decided.*

The Court should certify this case as a Fair Labor Standards Act ("FLSA") collective action as to the claim for relief asserted in the First Amended Complaint. Defendant Chevron Stations, Inc. ("Chevron") has pay practices that uniformly deprive thousands of employees of correct overtime payments.  The Complaint's fifth claim for relief states a claim pursuant to the FLSA for the nonpayment of overtime wages.  Under the FLSA:

> [A]n action commenced on or after the date of the enactment of this Act . . . under the Fair Labor Standards Act of 1938 . . . shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938 . . . it shall be considered to be commenced in the case of any individual claimant—(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or (b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256.

Plaintiff and the putative California Collective-Action Members were not paid the full overtime owing to them.  The Court should certify a collective action for employees whose overtime was underpaid due to Chevron's failure to compute properly the correct overtime rate.  Unlike Judge Illston's recent case, which dealt with off-the-clock allegations in an FLSA case,[1] the present action has a much more straightforward violation.  Here, individual differences among Chevron's employees are limited solely to readily quantifiable amounts owing on account of overtime miscalculated at an

---

[1] Castle v. Wells Fargo Fin., Inc., 2008 WL 495705 (N.D. Cal. Feb. 20, 2008).

incorrectly low rate.  In other words, for purposes of this Motion for Certification of a Collective Action, there is no dispute with respect to the number of uncompensated overtime hours; instead, there is only dispute as to the base hourly rate to be used in computing the unpaid overtime wages.

Chevron miscalculates and understates its employees' base rate of pay for many employees who, like Plaintiff, are paid a shift differential.  The miscalculation results in the payment of an incorrect overtime wage for those employees.  For example, on March 1, 2007, Plaintiff worked 8.5 hours during a night shift.  A copy of her "in station time sheet" and of her pay stub are attached as Exhibits 1 and 2, respectively, to the Declaration of Dr. Andrew Safir, filed herewith.  Plaintiff's overtime payment for this shift was computed by multiplying $8.50—her daytime rate of pay—by 1.5.  This is not the proper formula.

The FLSA states:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  The FLSA defines "regular rate":

> As used in this section the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee . . . .

Id. § 207(e).  As explained above, in the situation presently before the Court, Plaintiff variously worked day and night shifts, and her pay was subject to a differential:  Her daytime rate was $8.50 per hour, and her nighttime rate was $9.00 per hour.  Clearly, both her daytime earnings and her nighttime earnings fall within the FLSA's definition

of "regular rate." See Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945) ("[T]he regular rate refers to the hourly rate *actually* paid the employee for the normal, non-overtime workweek for which he is employed.") (emphasis supplied). See also Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 468–69 (2001) ("Where an employee receives a higher wage or rate because of undesirable hours or disagreeable work, such wage represents a shift differential or higher wages because of the character of work done or the time at which he is required to labor rather than an overtime premium. *Such payments enter into the determination of the regular rate of pay*.") (emphasis supplied). Accordingly, her nighttime rate needs to figure into the overtime-rate calculus.

This is the approach adopted by the Code of Federal Regulations. According to the Code of Federal Regulations, "[t]he general overtime pay standard in section 7(a) [29 U.S.C. § 207] requires that overtime must be compensated at a rate of not less than one and one-half times the regular rate at which the employee is actually employed." 29 C.F.R. § 778.107. The Code of Federal Regulations goes on to state:

> The "regular rate" under the Act is a rate per hour. The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek . . . . The regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.

Id. § 778.108. Moreover:

> Where an employee in a single workweek works at two or more different types of work for which different nonovertime rates of pay (of not less than

the applicable minimum wage) have been established, his regular rate for that week is the weighted average of such rates. That is, his total earnings (except statutory exclusions) are computed to include his compensation during the workweek from all such rates, and are then divided by the total number of hours worked at all jobs.

Id. § 778.115. In Allen v. Bd. of Public Education, 495 F.3d 1306 (11th Cir. 2007), the court approved a blended-rate approach in the context of bus drivers who were compensated differently depending on the particular duties they were performing:

Bus drivers and aides earn straight time at the rate of pay applicable to the particular duty they are performing. For example, if a driver drives a regular route for 25 hours in a week, and the driver's rate of pay for regular-route work is $11.00 an hour, he will earn $275. If that driver also drives 15 hours of field trips during the same week, he will earn an additional $90 (15 hours × $6/hour). If the driver also cleans his bus for 1 hour, drives an after-school route (taking students home following an after-school program) for 5 hours, and attends a safety-meeting for 2 hours, he will earn an additional 8 hours of work at the extended day rate of $7 an hour for a total of $56. Therefore, in this example, the driver has worked a total of 48 hours in a week and earned a total of $21 straight time.

Because the driver in this hypothetical worked over 40 hours in the week, he is also entitled to 8 hours of overtime (or an additional 1/2 time). The overtime rate of pay is based on the blended (or weighted) rate of pay. The total straight-time compensation ($421) is divided by the total hours worked (48) to determine the blended rate of pay at which to pay the overtime. In this example, the blended rate is $ 8.77. Because this driver has already been paid straight time (or 1 time) for those 8 hours, he is entitled to 1/2 of the blended rate ($4.39) for a total additional overtime compensation of $35.12.

1    Allen, 495 F.3d at 1310–11.

2        Applying these principles to Plaintiff, her correct overtime rate is calculated as

3    follows:  (($8.50 per hour × 24 hours) + ($9.00 per hour × 16 hours)) ÷ 40.5 total hours

4    worked = $8.59 per-hour blended rate.[2]  However, Plaintiff was paid at an overtime rate

5    of only $8.50 per hour.

6        Plaintiff contends that all employees who worked graveyard shifts have had their

7    undisputed overtime hours compensated at an artificially low level.  The problem is

8    further exacerbated in California, where Chevron failed to pay Plaintiff or putative Class

9    Members the additional hour of wages owing to them on account of missed rest periods

10   and meal breaks.  (See Compl. ¶¶ 26–27.)  As with the shift-differential wage, these

11   wages also must be considered when computing the magnitude of overtime.[3]

12

13

14   [2] This calculation does not take into consideration wages earned on account of work
     performed in lieu of meal periods and rest breaks.  See infra at 5:14–6:5.  Moreover, this
15   calculation is only one possible way to incorporate Plaintiff's nighttime rate into
     determining her regular rate of pay.  See, e.g., Burkhalter v. Sewerage & Water Bd., 791
16   So. 2d 665, 667–68 (La. Ct. App. 2000) (discussing different calculations that
     incorporate shift differentials).  Arguably, Plaintiff is entitled to be paid an overtime rate
17   based only on her $9.00 nighttime rate.  According to the Code of Federal Regulations:

18       Extra overtime compensation must be separately computed and paid on
         payments such as bonuses or shift differentials which are not included in the
19       computation of the established basic rate and which would have been
         included in the regular rate of pay.
20
         Example 1.  An employee is paid on an hourly rate basis plus a production
21       bonus, and also a shift differential of 10 cents for each hour worked on the
         second shift.  The authorized basic rate under the agreement is the
22       employee's daily average hourly earnings, and under the employment
         agreement he is paid one and one-half times the basic rate for all hours
23       worked in excess of 8 each day.  Suppose his production bonus is included
         in the computation of the basic rate, but the shift differential is not.  In
24       addition to overtime compensation computed at the basic rate the employee
         must be paid an extra 5 cents for each overtime hour worked on the second
25       shift.

26
     29 C.F.R § 548.502 (internal references omitted).
27
     [3] Murphy v. Kenneth Cole Productions, Inc., 40 Cal. 4th 1094 (2007), establishes that
28   these payments are, in fact, wages.

Again, under the FLSA, in computing the overtime rate, one must consider "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). To the extent that Chevron employees have been paid wages on account of missed meals and/or rest periods, or to the extent that such payments are due and unpaid, the overtime rates have been computed at an artificially low level.

Plaintiff's expert, Dr. Andrew Safir, has reviewed pertinent materials and concluded that "an estimation of FLSA damages that would be due employees who did not receive the correct overtime rate would be fairly straightforward and could be accomplished efficiently on a class-wide basis." (Decl. of Dr. Andrew Safir ("Safir Decl.") [attached to Harris Decl.] ¶ 15.) His conclusions are based on an analysis of Chevron documents. (Safir Decl. at 3 n.1.) According to Dr. Safir:

> Analysis of these documents indicates that Plaintiff's night-shift overtime payment of $6.28 was computed using an overtime rate of $12.75. This rate is equivalent to the $8.50 day-shift rate multiplied by 1.5 rather than an overtime rate of $13.50, computed using the $9.00 night-shift rate multiplied by 1.5.
>
> In addition, with respect to California employees, additional wages that are owed because of missed rest periods for employees who work alone, on the night shift, do not appear to have been included in Chevron's computation of Plaintiff's base rate. In other words, the base rate did not take account of either the $9.00 hourly rate, nor did it include the earnings from the additional hour of compensation earned by Plaintiff when she worked through her rest periods. The correct base rate should have been $81 of earnings (8 hours at $9 per hour plus $9 from one additional hour of compensation from missed rest periods) divided by 8 hours actually worked. This would be equivalent to a base rate of $10.125 per hour ($81 divided by 8), and a resulting overtime hourly rate of $15.1875.

(Safir Decl. ¶¶ 13–14.)

Moreover, although Chevron has produced copies of documents that purport to be "meal waivers," its policy or practice with respect to securing such documents seems utterly irrelevant.  At the California service stations, when one works alone on the graveyard shift or otherwise, it is simply not possible to take an uninterrupted rest period as required by law.[4]  Accordingly, an additional hour of pay is owed to each person who worked alone and missed his or her rest period.  The inevitable result of Chevron's pay practices was to shortchange such persons in computing their overtime pay rate.  The practices result in systematic violation of the FLSA, and, according to Dr. Safir, "with proper access to Defendant's computer records and other discovery, it will be possible to present evidence efficiently regarding class-wide damages incurred on account of Defendant's violations of the FLSA."  (Safir Decl. ¶17.)

## II.    The Law Applicable to a Request for Certification:  Only a Modest Showing Needs to Be Made.

Collective actions under the FLSA are governed by 29 U.S.C. § 216(b).  The distinctive feature of a collective action, setting it apart from class actions under Rule 23 of the Federal Rules of Civil Procedure, is that the members of a collective action must affirmatively opt into the action in writing and thus become party plaintiffs.  29 U.S.C. § 216(b).  Party plaintiffs are entitled to the benefits of the action and will be bound by the result.  Persons who do not opt into the action do not become parties, will not share in the benefits, and will not be bound by the result.  The Court should set a routine schedule for briefing the issues so that prospective members of the collective action may affirmatively opt into the action.

Judge Illston recently summarized some of the applicable law:

Section 216(b) of the FLSA provides that one or more employees may bring a collective action "on behalf of himself or themselves and other

---

[4] If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.  Cal. Lab. Code § 226.7(b).

1   employees similarly situated." 29 U.S.C. § 216(b). "[P]laintiffs need show

2   only that their positions are similar, not identical, to the positions held by

3   the putative class members." Grayson v. K Mart Corp., 79 3d 1086, 1096

4   (11th Cir. 1996) (internal citation and quotation omitted), *cert. denied*, 519

5   U.S. 982 (1996). Plaintiffs bear the burden of demonstrating a "reasonable

6   basis" for their claim of class-wide discrimination. See id. at 1097. "The

7   plaintiffs may meet this burden, *which is not heavy*, by making substantial

8   allegations of class-wide discrimination, that is, detailed allegations

9   supported by affidavits which successfully engage defendants' affidavits to

10  the contrary." Id. (internal citation and quotation omitted).

11  Castle v. Wells Fargo Fin., Inc., 2008 WL 495705 at *2 (N.D. Cal. Feb. 20, 2008)

12  (emphasis supplied).

13      In employment cases, individual actions, whether administrative or civil, are often

14  thwarted by employees' reluctance to challenge their employer. See Wang v. Chinese

15  Daily News, Inc., 231 F.R.D. 602, 614 (C.D. Cal. 2005) ("Proceeding by means of a

16  class action avoids subjecting each employee to the risks associated with challenging an

17  employer"); St. Marie v. Eastern R.R. Ass'n., 72 F.R.D. 443, 449 (S.D.N.Y. 1976) ("The

18  risks entailed in suing one's employer are such that the few hardy souls who come

19  forward should be permitted to speak for others when the vocal ones are otherwise fully

20  qualified"), *rev'd on other grounds*, St. Marie, 650 F.2d 395 (2d Cir. 1981).[5] Class and

21  collective actions in employment cases are thus viewed favorably. This is especially true

22  given the remedial nature of the overtime laws at issue in this case.

23      Collective actions are governed by 29 U.S.C. § 216(b). There are two

24  requirements for certifying a collective action. First, the persons other than the named

25  plaintiffs whose claims are to be asserted collectively must be "similarly situated" with

26  the named plaintiff. Second, these persons must give their consent in writing. The

27

28      [5] Plaintiff herewith submits a Declaration in support of her Motion, and, on March 14, 2008, she provided her deposition.

statute permits maintaining against an employer in any federal or state court of competent jurisdiction suits brought by employees by "any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). "No employee shall be a party Plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed with the court in which such action is brought." Id.

The U.S. Supreme Court has held that courts are authorized to supervise the contents of the notice to be sent to the absent parties and that discovery of the identity of such absent parties is authorized. Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165, 169–70, 172–73 (1989).[6] Implicit in the Hoffman-La Roche, Inc. opinion is the fundamental proposition, mandated by the statutory language, that a collective action is distinct and different from the various forms of class actions for which provision is made in Rule 23 of the Federal Rules of Civil Procedure and section 382 of the California Code of Civil Procedure.

There is substantial federal authority for the proposition that the "similarly-situated" requirement is met by a "modest factual showing" that "'requires nothing more than substantial *allegations* that putative class members were victims together of a single decision, policy or plan.'" Bayles v. Am. Med. Response, 950 F. Supp. 1053, 1066 (D. Colo. 1996) (quoting Sperling v. Hoffman-La Roche, Inc., 118 F.R.D. 392, 407 (D.N.J. 1988)) (emphasis supplied). See also Realite v. Ark Rests. Corp., 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998). A majority of district courts, including those in the Ninth Circuit, utilize a two-tiered process. See, e.g., Lemus v. Burnham Painting & Drywall Corp., 2007 LEXIS 46785 at *15–16 (D.C. Nev. 2007) ("The court finds that plaintiffs' complaint allegations, coupled with their declarations which aver they regularly worked in excess of forty hours per week without overtime pay compensation, and that all of the painters with whom they worked, worked similar hours and were not paid overtime, meet

---

[6] The cited case was one arising under the Age Discrimination in Employment Act, 29 U.S.C. § 626(b), but that statute, as emphasized throughout the opinion, expressly borrows the collective-action mechanism found in 29 U.S.C. § 216(b).

1  the plaintiffs' threshold burden.  For purposes of the first tier of the two-tier analysis,

2  plaintiffs have established they are similarly situated to other plaintiffs employed by

3  Burnham and Centennial for purposes of Section 216(b) conditional certification and

4  notice.  Plaintiffs have made substantial *allegations* that defendants Burnham and

5  Centennial had a policy or plan which deprived the plaintiffs of overtime pay in violation

6  of the FLSA.  The fact intensive inquiries concerning whether the plaintiffs are

7  independent contractors or employees for purposes of the FLSA, and detailed analysis of

8  whether the plaintiffs are sufficiently similarly situated to maintain the class are more

9  appropriately decided after notice has been given, the deadline to opt in has passed, and

10  discovery has closed.  Once discovery has been completed, the defendants may move to

11  decertify the collective action class on a fully developed record.") (emphasis supplied);

12  Edwards v. City of Long Beach, 467 F. Supp. 2d 986, 990 (C.D. Cal. 2006) ("The Court

13  follows the majority approach and applies a two-step approach for determining whether

14  certification of a § 216(b) collective action is appropriate."); Leuthold v. Destination

15  Am., 224 F.R.D. 462, 467 (N.D. Cal. 2004) (proceeding under two-tiered analysis,

16  "given that the majority of courts have adopted it"); Wynn v. NBC, 234 F. Supp. 2d

17  1067, 1082–84 (C.D. Cal. 2002) (same).

18        Courts adhering to this approach make "two determinations, on an ad hoc, case-

19  by-case basis."  Id. at 1082.  At the initial "notice stage," the court decides whether a

20  class should be certified based on the pleadings, affidavits, and other evidence in the

21  record.[7]  "Due to the minimal evidence at the court's disposal, this determination is made

22  based on a fairly lenient standard, and typically results in a 'conditional certification' of

23  a representative class."  Id.  The court then proceeds to authorize and monitor the

24  issuance of 'notice' to prospective members.  Id.

25        A second, more rigorous review is undertaken after the plaintiff has propounded

26  discovery, usually on a motion for decertification by the defendant.  Here, the court

27

28        [7] Judge Illston's decision in Wells Fargo Financial, Inc. was obviously made after
extensive discovery was concluded.  It is aberrational in that respect.

1   weighs several factors in determining whether the collective plaintiffs are "similarly

2   situated." Id. In addition to the fruits of discovery, the court considers (1) whether a

3   sufficient link exists between the alleged policy and the challenged employer actions, (2)

4   whether individual issues would predominate at trial; and (3) whether a trial of the action

5   could be coherently managed and evidence could be presented in a manner that would

6   not confuse the jury or unduly prejudice any party. Id. at 1084 (citing Thiessen v. G.E.

7   Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001). The inquiry into whether

8   proposed class members are similarly situated is necessarily fact-specific. Id. at 1081.

9   Here, Plaintiff is similarly situated vis-à-vis members of the collective action in

10  that (a) Plaintiff and the putative Collective-Action Members were employed by

11  Defendant, (b) Plaintiff and the putative Collective-Action Members were non-exempt

12  employees, and (c) Defendant did not properly pay Plaintiff and the putative Collective-

13  Action Members overtime wages because Defendant failed to use the appropriate base

14  hourly rate by failing to consider either shift differentials or the additional wages that

15  accrue when an employee works through a meal period or rest break. "[T]he federal

16  FLSA . . . is remedial in nature and must be 'liberally construed.'" Bureerong v.

17  Uvawas, 922  F. Supp. 1450, 1469 (C.D. Cal. 1996). Accordingly, this action is

18  maintainable as an opt-in collective action pursuant to 29 U.S.C. § 216(b) as to claims

19  for unpaid overtime wages, liquidated damages, costs, and attorney's fees under the

20  FLSA.

21  Johnson v. TGF Precision Haircutters, Inc., 319 F. Supp. 2d 753 (S.D. Tex. 2004),

22  contains a condensed but broad-ranging overview of the law applicable to certifying

23  collective actions. The opinion discusses the two-stage approach. Johnson, 319 F. Supp.

24  2d at 754. In this approach, the first stage consists of a judicial determination, based on

25  the pleadings and affidavits, as to whether notice should be given to absent class

26  members. Id. The test employed to make this initial determination as to whether the

27  similarly-situated criterion has been met is a lenient one, usually resulting in a

28  "conditional certification" of the class. Id. at 754–55. The court then supervises the

giving of notice to the potential members of the collective action and may properly order discovery that is necessary to ascertain the identity and location of such members. Id. Following this, typically after the close of discovery, the defendants may move for decertification. See id. At this second stage, the court makes a factual determination, based on evidence including the fruits of discovery, as to whether the similarly-situated test has been met. Id. If it determines that the class members are similarly situated, then the action proceeds as a representative or collective action. Id. If not, the court dismisses the opt-in plaintiffs *without prejudice* and allows the class representatives to proceed to trial on their individual claims. Id.

Plaintiff submits that the two-stage procedure described in Johnson is a common-sense approach that safeguards the essential rights and interests of all concerned. The two-stage approach was followed in Pendlebury v. Starbucks Coffee Co., 2005 U.S. Dist. LEXIS 574 (S.D. Fla. 2005), with that court following the "fairly lenient standard" and granting conditional certification of a representative FLSA class. Pendlebury at *8. Chevron failed to use the appropriate base hourly rates when computing overtime rates payable to its employees. Chevron also failed to include wages earned on account of missed meal and rest breaks. This satisfies the similarly-situated test as recited in cases such as Realite. Accordingly, the Court should issue an order conditionally certifying this case as a collective action insofar as the FLSA counts are concerned. Following such conditional certification, Defendant should be required to disclose, to the extent that such data have not already been disclosed, the identities and last known addresses of each of the persons, other than the named Plaintiff herein, who worked for it. This Court should then approve a form of notice that contains a concise description of the litigation and that specifically advises the recipient that he or she will not be included in the action unless he or she executes an "opt-in" form.

When the identities of the "opt-ins" have been established, the case should then proceed as a collective action through discovery on the merits. The defense, of course, will have the right to make a motion to decertify at an appropriate time. Again, if such a

motion is granted, the action is dismissed *without prejudice* as to the "opt-ins." If the
motion is denied, then the action will proceed to final disposition as to the "opt-ins" and
Plaintiffs. The evidence will demonstrate that Defendant hired Plaintiff and the putative
Collective-Action Members to work for it but that Defendant did not properly
compensate them. All who were underpaid should be entitled to their share of their
damages under the FLSA.

Proceeding in the fashion suggested avoids a multiplicity of lawsuits, which is of
benefit to the Court and to all parties. It avoids the risk that unpaid current and former
employees may, being ignorant of their rights and without sufficient economic means to
undertake the litigation on their own, lose all rights to collect the damages and penalties
to which they are entitled. Finally, because the procedure requires that each current or
former employee affirmatively opt into the litigation in writing, the parties and the Court
will know with considerable certainty just how many claimants are involved very soon
after the deadline for opting in has expired.

In determining to certify the requested collective action, this Court should not
make deep inquiry into substantive evidentiary issues. Indeed, as the Court has already
concluded, there is no need for a prolonged briefing schedule and intense discovery.
(Order Setting Briefing Schedule for Pl.'s Mot. to Conditionally Certify the Collective
Action at 1:15–2:4 (stating that "[t]he burden, which is not heavy, is on Plaintiff to make
a threshold showing to certify a collective action" and that "[t]he Court is not persuaded
that extra time is warranted to brief the motion to certify").) The first major Supreme
Court case to address this issue was Eisen v. Carlisle and Jacquelin, 417 U.S. 156
(1974). In Eisen, the district court determined that the Rule 23 class-certification
requirements had been satisfied. Id. at 161. In determining which party should bear the
cost of providing notice to the class, the district court reasoned that it was unfair to
impose the cost of notice on the defendants unless the plaintiffs showed a probability of
success on the merits. Id. at 167–68. The Supreme Court reversed, holding that the
plaintiffs were required to bear the cost of notice to the class because it found "nothing

1 in either the language or history of Rule 23 that gives a court any authority to conduct a

2 preliminary inquiry into the merits of a suit in order to determine whether it may be

3 maintained as a class action." Id. at 177.  Additionally, the Court reasoned that a

4 preliminary inquiry into the merits was improper because it would provide the plaintiffs

5 with a determination on the merits "without any assurance that a class action may be

6 maintained" and so might "color the subsequent proceedings" and "place an unfair

7 burden on the defendant." Id. at 177–78. See also, e.g., Alba v. Papa John's USA, 2007

8 U.S. Dist. LEXIS 28079 at *14 (C.D. Cal. 2007) ("In deciding a motion to certify a class,

9 the court may not evaluate whether the plaintiff is likely to prevail on the merits of the

10 stated claims.") (citing Eisen, 417 U.S. at 177–78).

11    In Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975), the Ninth Circuit established

12 its standard concerning a district court's evaluation of the Rule 23 factors:

13    The court is bound to take the substantive allegations of the complaint as

14    true, thus necessarily making the class order speculative in the sense that the

15    plaintiff may be altogether unable to prove his allegations.  While the court

16    may not put the plaintiff to preliminary proof of his claim, it does require

17    sufficient information to form a reasonable judgment.  Lacking that, the

18    court may request the parties to supplement the pleadings with sufficient

19    material to allow an informed judgment on each of the Rule's requirements.

20 Blackie, 524 F.2d at 901 n.17.  The Ninth Circuit also cited Eisen even though Blackie

21 involved a determination of the Rule 23 requirements rather than the apportionment of

22 the cost of providing notice to class members:

23    The Court made clear in Eisen [] that that determination does not permit or

24    require a preliminary inquiry into the merits, 417 U.S. at 177–178; thus the

25    district judge is necessarily bound to some degree of speculation by the

26    uncertain state of the record on which he must rule.  An extensive

27    evidentiary showing of the sort requested by defendants is not required.  So

28    long as he has sufficient material before him to determine the nature of the

1   allegations, and rule on compliance with the Rule's requirements, and he

2   bases his ruling on that material, his approach cannot be faulted because

3   plaintiffs' proof may fail at trial.

4   Id. at 901.

5       Blackie suggests that a district court may not resolve factual disputes.  For

6   example, Blackie mandates that a district court take the factual allegations as true.  Id. at

7   901 n.17.  Such an inference seems to bar a district court from resolving factual disputes

8   against the plaintiff so long as the plaintiff has alleged sufficient facts to create a dispute.

9   Additionally, Blackie precludes a district court from putting a plaintiff to preliminary

10  proof of his claim.  Id.  Finally, Blackie cites Eisen for the proposition that a court may

11  not make a preliminary inquiry into the merits.  Id. at 901.  This extension of Eisen

12  beyond the notice context suggests that the Ninth Circuit intended to preclude a

13  weighing of evidence at the class-certification stage.

14      One decision to address whether a court may resolve factual disputes is Osmer v.

15  The Aerospace Corp., 1982 U.S. Dist. LEXIS 15927 (C.D. Cal. 1982).  In Osmer, the

16  plaintiff alleged that the defendant had applied certain discriminatory policies on a class-

17  wide basis.  Id. at *2.  The plaintiff submitted affidavits and statistical studies based on a

18  regression analysis of data "on employee advancement and salary."  Id. at *5 n.2.  The

19  defendant submitted declarations "asserting that plaintiff's expert opinion is statistically

20  unsound, that management level personnel made their decisions in a non-discriminatory

21  manner, and affidavits of various female employees who claim they were not held back

22  by any policy of defendant."  Id. at *10.  The Court held that "[t]aking the

23  representations alleged by plaintiff in the complaint, and the statistical proof offered,

24  along with the affidavits, the plaintiff has presented common questions capable of

25  resolution in the context of a class suit."  Id.  The court observed that it was not ruling

26  "on whether the contrary affidavits of defendant are sufficient to prevail on the merits . . .

27  [but instead] that, under the test mandated by Blackie, 524 F.2d at 901, the plaintiff has

28  shown that questions of fact which would be common to the whole class are presented by

1    the pleadings and material submitted." Id.

2         The Ninth Circuit recently issued an opinion that reiterates the general concept

3    that certification should not be a factually intensive process.  In Dukes v. Wal-Mart, Inc.,

4    female Wal-Mart employees alleging sex discrimination brought a Title VII class action

5    against Wal-Mart.  Dukes, 474 F.3d 1214 (9th Cir. 2007).  The district court certified the

6    class for certain of the plaintiffs' claims, and the Ninth Circuit affirmed.  Id.

7         One of the principal issues raised by Wal-Mart on appeal was whether the

8    plaintiffs had satisfied Rule 23(a)(2)'s commonality requirement by presenting evidence

9    that Wal-Mart engaged in discriminatory practices that affected all of the plaintiffs in a

10   common manner.  Id. at 1225.  To establish commonality, the plaintiffs submitted factual

11   evidence, expert opinions, expert statistical evidence, and anecdotal evidence.  Id.  For

12   example, the plaintiffs' expert sociologist explained that "Wal-Mart has and promotes a

13   strong corporate culture—a culture that may include gender stereotyping." Id. at 1226.

14   The plaintiffs' expert concluded "(1) that Wal-Mart's centralized coordination,

15   reinforced by a strong organizational culture, sustains uniformity in personnel policy and

16   practice; (2) that there are significant deficiencies in Wal-Mart's equal employment

17   policies and practices; and (3) that Wal-Mart's personnel policies and practices make pay

18   and promotion decisions vulnerable to gender bias." Id.

19        Wal-Mart argued that the expert's third conclusion was vague, imprecise, and

20   failed to satisfy Daubert.  However, the district court rejected Wal-Mart's argument,

21   explaining that Wal-Mart's challenges "'are of the type that go to the weight, rather than

22   the admissibility, of the evidence.'" Id. at 1227 (quoting Dukes v. Wal-Mart, Inc., 222

23   F.R.D. 189, 191–92 (N.D. Cal. 2004)).  The Ninth Circuit agreed, explaining that "[t]he

24   district court was on very solid ground here as it has long been recognized that

25   arguments evaluating the weight of evidence or the merits of a case are improper at the

26   class certification stage." Id. (citing Eisen, 417 U.S. at 177 ("[W]e find nothing in either

27   the language or history of Rule 23 that gives a court any authority to conduct a

28   preliminary inquiry into the merits of a suit  in order to determine whether it may be

maintained as a class action."); Selzer v. Bd. of Educ. of City of New York, 112 F.R.D. 176, 178 (S.D.N.Y 1986) ("A motion for class certification is not the occasion for a mini-hearing on the merits.")). The Ninth Circuit also stated that "courts need not apply the full Daubert 'gate-keeper' standard at the class certification stage." Dukes, 474 F.3d at 1227. "Rather, 'a lower Daubert standard should be employed at this [class certification] stage of the proceedings.'" Id. (quoting Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc., 209 F.R.D. 159, 162 (C.D. Cal. 2002)).

Similarly, the plaintiffs' expert statistician presented statistical evidence of class-wide discrimination based on data collected at a regional level. Dukes, 474 F.3d at 1228. Wal-Mart claimed that "the district court erred by not finding Wal-Mart's statistical evidence more probative than the plaintiffs' evidence because, according to Wal-Mart, its analysis was conducted store-by-store" rather than at a regional level. Id. at 1229. The Ninth Circuit rejected Wal-Mart's argument that class certification should not have been granted because Wal-Mart's statistical evidence was more probative:

> [O]ur job on this appeal is to resolve whether the "evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive" to the trier of fact. In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 135 (2d Cir. 2001). Thus, it was appropriate for the court to avoid resolving "the battle of the experts" at this stage of the proceedings. See, Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292–293 (2d Cir. 1999) (noting that a district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts).

Dukes, 474 F.3d at 1229.

Thus, Dukes appears to have established three propositions. First, the Dukes majority explains that challenges to expert opinions constitute merits determinations that go to the weight of the evidence rather than to admissibility. Id. at 1227. Thus, a district court is not permitted to discount the testimony of a plaintiff's expert merely because the

defendant has challenged some aspect of the expert's opinion.  Id.  Second, Dukes extended the holding of Eisen to determinations involving Rule 23 requirements.  Id.  As discussed above, numerous courts have extended Eisen beyond its original holding, including the Ninth Circuit in Blackie.  Finally, the Dukes majority held that a court may not weigh conflicting evidence in determining whether the Rule 23 requirements have been satisfied.  Id. at 1229.  Where both plaintiffs and defendants have proffered expert testimony, the court must avoid resolving a "battle of the experts" in a motion for class certification.  Id.  Therefore, at a minimum, Dukes establishes that a court may not resolve factual conflicts concerning expert opinions in a motion for class certification.  Read more broadly, Dukes could be interpreted as holding that a district court may not resolve any factual disputes in determining whether the Rule 23 requirements are satisfied.

Such a reading of Dukes is essentially required in light of Dukes' reliance on the Second Circuit cases of Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999) and In re Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001).  The Ninth Circuit explicitly relied on In re Visa Check/ MasterMoney Antitrust Litigation in concluding that a court should determine whether "'evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence ultimately will be persuasive' to the trier of fact."  Dukes, 474 F.3d at 1229 (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d at 135).  Even if Dukes does not implicitly adopt the "fatal flaw" standard, its reliance on In re Visa Check/MasterMoney Antitrust Litigation establishes that a court cannot deny a motion for class certification simply because experts disagree over the proper methodology.  A plain reading of Dukes, then, clearly demonstrates that the Ninth Circuit intended to prohibit district courts from weighing conflicting evidence when determining whether the Rule 23 requirements have been satisfied.

In L.H. v. Schwarzenegger, 2007 U.S. Dist. LEXIS 18728 (E.D. Cal. Feb. 28, 2007), plaintiff juvenile parolees alleged that California has a policy and practice of

1    denying class members with disabilities their statutory rights under the Americans with

2    Disabilities Act.  The defendants argued that the class plaintiffs were not in fact disabled

3    and that, therefore, neither of the plaintiffs satisfied the typicality requirement.  Id. at

4    *12.  In support of their position, the defendants submitted educational records of the

5    plaintiffs.  Id.  The district court noted that, "although the allegations in the complaint

6    must be taken as true for the purposes of class certification, the court is 'at liberty' to

7    consider evidence that relates to the merits if such evidence also goes to the requirements

8    of Rule 23."  Id. at *26 (internal citations omitted).  However, the district court went on

9    to reject the defendants' argument that the plaintiffs were not typical because the

10    plaintiffs were not, in fact, disabled.  Id. at *34–39.  The court explained that "arguments

11    evaluating the weight of evidence or the merits of a case are improper at the class

12    certification stage" and "plaintiffs need only provide sufficient information for the court

13    to form a reasonable judgment about whether plaintiffs' claims are typical."  Id. at *37

14    (quoting Dukes, 474 F.3d at 1227)).  The court concluded that, "[i]n examining the

15    allegations set forth in the complaint, as well as the evidence submitted by both plaintiffs

16    and defendants, the court finds that there is sufficient information to conclude that

17    plaintiffs' claims are typical of the class."  Id. at *37.

18    **III.    _Notice._**

19        A proposed form of Notice is attached to the Harris Declaration as Exhibit 3.

20    Gilardi & Co., LLC ("Gilardi") of California is a full-service class-action claims

21    administrator with a great deal of experience in all aspects of the process, from notice

22    and publication through final distribution and reporting.  (Harris Decl. in Supp. of Pl.'s

23    Mem. in Supp. of Mot. for Certification of Collective Action ¶ 6.)  Plaintiff suggests that

24    this Court appoint Gilardi as administrator and order Chevron to provide to Gilardi an

25    electronic list of the California class members so that Gilardi may send notice to them by

26    first-class mail.

27    **IV.    _Conclusion._**

28        For all of the foregoing reasons, the Court should certify the requested collective

action.

DATED:  April 1, 2008                    HARRIS & RUBLE

                                         ___/s/_____
                                         Alan Harris
                                         *Attorneys for Plaintiffs*

PL.'S MEM. OF P. & A. IN SUPP. OF MOT. FOR CERTIFICATION OF COLLECTIVE ACTION

# PROOF OF SERVICE

I am an attorney for Plaintiff herein, over the age of eighteen years, and not a party to the within action.  My business address is Harris & Ruble, 5455 Wilshire Boulevard, Suite 1800, Los Angeles, California 90036.  On April 1, 2008, I served the within document(s):  **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CERTIFICATION OF COLLECTIVE ACTION**.

I caused such document(s) to be delivered by hand in person to:

> N/A

I caused such document(s) to be delivered by fax or e-mail to:

> N/A

I am readily familiar with the Firm's practice of collection and processing correspondence for mailing.  Under that practice, the document(s) would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business, addressed as follows:

> N/A

I caused such document(s) to be delivered via the Court's CM/ECF System to:

> Deborah Crandall Saxe
> dsaxe@jonesday.com
>
> Catherine Suzanne Nasser
> cnasser@jonesday.com
>
> Aaron L. Agenbroad
> alagenbroad@jonesday.com
> saltamirano@jonesday.com

I declare under penalty of perjury that the above is true and correct.  Executed on April 1, 2008, at Los Angeles, California.

_____
David Zelenski